# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMAR L. TRAVILLION, | : | |
| Plaintiff, | : | 1:14-cv-1159 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| JOHN E. WETZEL, et al., | : | |
| Defendants | : | |

## MEMORANDUM

### September 25, 2017

Plaintiff Jamar L. Travillion ("Travillion" or "Plaintiff"), a Pennsylvania state inmate, incarcerated at the State Correctional Institution at Rockview ("SCI-Rockview") at all times relevant, commenced this civil rights action on June 17, 2014. (Doc. 1). The following claims remain: (1) Eighth (Count 2) and Fourteenth (Count 5) Amendment failure to protect claims against Unit Manager Clark, Lieutenants Sutton, Kearns, and Hardy, Sergeant Burton, and Officers Sherman, Crawford, Stover, Duncan, Rutherford, Gates and Druckemiller; (2) Eighth (Count 3) and Fourteenth (Count 6) Amendment denial of adequate medical care claims lodged against Officers Perks and Weaver; and (3) State law claims of Willful Misconduct (Count 10) and Intentional Infliction of Emotional Distress (Count 11), brought against all Defendants. (Doc. 45).

Before the Court is Defendants' motion (Doc. 58) for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the motion will be granted with respect to the constitutional claims. The Court will decline to exercise supplemental jurisdiction over the state law claims.

## I.    Standard of Review

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.*; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United*

*Brotherhood of Carpenters and Joiners of America*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Wooler v. Citizens Bank*, 274 F. App'x 177, 179 (3d Cir. 2008). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex.* at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). "[T]he non-moving party 'may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.'" *Picozzi*

*v. Haulderman*, 2011 WL 830331, *2 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(e)(2)). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America. Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## II.    <u>Statement of Material Facts</u>

On May 5, 2012, Travillion was transferred to G Block cell GB1015, in the Restricted Housing Unit ("RHU") at SCI-Rockview, and assigned cellmate Keith Johnson ("Johnson"). (Doc. 63, ¶¶ 6, 7; Doc. 70, ¶¶6, 7). On that same date, Johnson's prior cellmate, Terrance Thomas ("JJ7915"), was moved out of cell GB1015. (*Id.* at 8; *Id.* at 8).

According to the Unit Manager, Defendant Clark, Thomas was moved "based on his request for a standard cell change due to personal issues." (Doc. 63, ¶¶ 8, 17; Declaration of Unit Manager Sharon Clark ("Clark Decl."), Doc. 63-6, ¶14). Travillion disputes this statement and, in support, submits the declaration of Inmate Shawn Hampton ("Hampton Decl."). (Hampton Decl., Doc. 70-1, pp. 29-30). Hampton "witnessed RHU staff escort Inmate Keith Johnson's cell partner from his cell to somewhere. I know this inmate to go by the nickname 'Cash'." (*Id.* at p. 29, ¶ 3). Hampton declares that when Cash was returned to his cell, "a

commotion erupted." (*Id.* at 4). He describes the scene as follows: "Once they were out of my view I heard staff yelling at Inmate Johnson to backup and put his hands through the slot to be handcuffed. I heard Inmate Johnson yelling too. But I couldn't understand what he was saying. He was behind the cell door and staff was yelling over him. Yelling orders at him to backup and whatnot. This commotion went on for several minutes. Eventually staff escorted 'Cash' away somewhere." (*Id.*) Thereafter, Hampton witnessed Travillion being placed in the cell with Inmate Johnson. (*Id.* at p.30, ¶ 6).

When an inmate enters the RHU, before they are assigned a cell, the Unit Manager checks to see if the inmate has any type of housing restriction, such as medical or security. (Doc. 63, ¶ 9).

With regard to a medical restriction, DOC Policy 11.2.1, Section 5(c), provides that the following inmates may be considered for what is referred to as Z code housing classification: (a) inmates who have been evaluated by psychiatric or psychological staff as having mental health problems; (b) inmates with medical conditions indicating a possible need for a single cell; (c) an inmate who staff believes may be victimized a result of double-celling; (d) an inmate who has a documented history or predatory behavior towards cell partners or who staff has reason to believe would exhibit assaultive or predatory behavior towards cell

partners; (e) an inmate with known or documented homosexual behavior. (*Id.* at 12; Doc. 63-6, pp. 5, 6). A Superintendent of a facility may assign an inmate a Z Code upon recommendation by an inmate's unit management team in conjunction with the psychology department. (*Id.* at 11). Johnson did not have a Z Code or any medical housing restriction on May 5, 2012. (*Id.* at 13). Travillion disputes the lack of medical restriction designation based on Defendants' response to Paragraph 9 of his request for admissions. (Doc 70 ¶ 9). Defendants' response explicitly states "DENIED. It is DENIED that Inmate Johnson was suffering from any mental illness that constituted a danger to Plaintiff. To the extent that Inmate Johnson may have suffered from other mental health needs, the Answering Defendants OBJECT to the Request as seeking protected medical and mental health information related to another individual." (Doc. 70-1, p. 7, ¶ 9). However, after the June 14, 2012 attack, Johnson was referred for a "Psych Evaluation" based on a determination that he was a danger to himself and others. (Doc.70-2, p. 39).

On the issue of housing security restriction, Clark indicates that Johnson did not have a history of institutional violence. (*Id.* at 14). Travillion disputes this fact. (Doc. 70, ¶¶ 14, 16). Johnson's relevant institutional conduct has been extracted from the various documents filed by the parties and is set forth below.

On December 11, 2011, Johnson was charged in Misconduct Report B500609, with refusing to obey an order, presence in an unauthorized area, and threatening an employee or their family with bodily harm. (Doc. 70, ¶¶ 9-14; Doc. 70-2, p. 16). According to the report, when a correctional officer failed to accede to Johnson's demands to open his cell door, Johnson approached the officer in a threatening manner with closed fists. (Doc. 70-2, p. 16). Johnson refused several orders to return to "blockout," which resulted in the officer locking him in his cell. (*Id.*) A misconduct hearing took place on December 13, 2011; Johnson was found guilty of refusing to obey an order and presence in an unauthorized area and sanctioned to fifteen days of disciplinary confinement to be served consecutively. (*Id.* at 17). The hearing examiner dismissed the charge of threatening an employee or their family with bodily harm. (*Id.*)

On April 5, 2012, following an incident in which Johnson shoved Correctional Officer Miller and "chest bumped" him, he was charged in Misconduct Report B505115, with Class 1 assault and using abusive, obscene, or inappropriate language to an employee. (Doc. 63, ¶ 15; Doc. 70, ¶¶ 9, 14, 15; Doc. 70-2, p. 14). On that same date, Johnson received a second misconduct, Misconduct Report B505113, charging him with threatening an employee or their family with bodily harm after stating "I'm gonna kill CO Miller when I get out of

the hole. I'm going to take a pen and stab his eyes out and kill him." (Doc. 70, ¶ 14; Doc. 70-2, p. 12).

At his April 10, 2012 misconduct hearing on Misconduct Report B505115, Johnson pled not guilty to the charges. (Doc. 70-2, p. 15). The hearing examiner found him guilty of both offenses and sanctioned him to two ninety day terms of disciplinary confinement to be served consecutive to one another. (*Id.*) On that same date, he pled guilty to the charge in Misconduct Report B505113, and was sanctioned to a ninety day term of disciplinary confinement to be served consecutive to the prior terms imposed. (*Id.* at 13).

On April 24, 2012, Defendant Rutherford charged Johnson in Misconduct Report 505060 with threatening an employee and using abusive, obscene, inappropriate language to an employee based on the following: "On the above date and time GU2932 Johnson did say to this officer 'You is a stone cold pussy' I replied 'Excuse me?' GU2932 then stated 'F*** you pussy, you heard what I said.' GU2932 then went on to say 'Wait till I get out of the Mother F***ing cell, Im'a F*** you face up pussy, you bought it.' It is unknown to this officer what caused this obscene outburst from GU2932." (*Id.* at 9). Defendant Duncan witnessed the incident. (*Id.*) At his hearing, Johnson pled guilty to the use of

abusive, obscene, inappropriate language. (*Id.* at 10). The charge of threatening an employee was dismissed. (*Id.*)

Johnson was housed with two other inmates between April 5, 2012, the date of his initial transfer into the RHU, and May 5, 2012. (Doc. 63, ¶ 16). Neither inmate complained of a fear or threat of violence or physical harm in connection with their cell assignment with Johnson. (*Id.* at ¶ 18). Travillion was housed with Johnson from May 5, 2012 until June 14, 2012. (*Id.* at ¶ 19; Doc. 70, ¶ 19).

Defendants state that neither Johnson nor Travillion complained to Defendant Clark about any threat or fear of violence or physical harm on May 5, 2012, or during the time that they were celled together. (Doc. 63, ¶ 20). They also indicate that Defendants Clark, Hardy, Sutton, Duncan, Rutherford, Gates, and Druckemiller were unaware of any risk of harm to Travillion. (*Id.* at 21). However, Travillion did alert staff that he believed Johnson "was crazy" and that, as a result of Johnson's mental health issues, he feared that Johnson might be violent. (*Id.* at 22). In disputing these statements, Travillion primarily relies on his own declaration. (Doc. 70, ¶¶ 20-22; Doc. 70-3 pp. 16-25; Travillion Deposition Transcript ("Travillion Dep.", Doc. 70-3, p. 35). He declares that on May 15, 2012, May 19, 2012, May 23, 2012, and May 29, 2012, he expressed to Defendant Sutton his concerns about Johnson's mental health and reputation for violence and

requested a cell reassignment. (Doc. 70-3, ¶¶ 8-11). On the first and second

occasions, Sutton instructed him to submit written requests, which he did, but to no

avail. (*Id.* at 8, 9). Defendant Sutton "did not take well to [Travillion's] demands"

on the third occasion. (*Id.* at 10). Sutton directed him to be patient because the

RHU was tight on space and he needed more time to arrange the move. (*Id.*) The

May 29, 2012 exchange came during a "shake-down" of the cell. (*Id.* at 11).

Sutton refused to entertain Travillion's cell assignment complaints in the context of

the shakedown. (*Id.*) On June 5, 2012, he explained to Defendant Hardy that

"Inmate Johnson was making combative gestures and threats of physical violence

at [him]…every day" and that he was getting the "run around with regard to [his]

requests for reassignment." (*Id.* at 13). Hardy responded that he had no authority

to reassign cells and instructed Travillion to make a verbal request to Defendant

Clark when she toured the unit with the Program Review Committee ("PRC") as

she was the only person authorized to alter cell assignments. (*Id.*) On June 7,

2012, during the PRC tour, Travillion informed Defendant Clark that Johnson was

making violent threats and gestures and that he did not feel safe. (Doc. 70-3, ¶ 14).

He requested an immediate cell reassignment. (*Id.*) He followed up with a written

request but received no response. (*Id.*) The written request dated June 7, 2012, is

attached to Travillion's grievance and states as follows:

As a follow-up to our conversation earlier today I would again request I be moved from my current cell arrangement immediately. My cellie (Johnson #GU2932) is exhibiting very strange behavior. Behavior which leads me to believe he is obviously suffering from some type of psychosis or other mental anguish. Johnson's behavior is a danger to him and most importantly to me. I've already advised RHU staff of this problem. As you said you would today, they seem to take the problem as nonchalantly as you seem to. I don't need or want any trouble. See to it that I am moved from my current predicament immediately please.

(Doc. 63-12, p. 49). Clark denies having received any such request. (Doc. 63-6, ¶ 22). Travillion does not know wherther Clark received the request. (Travillion Dep., Doc. 70-3, pp. 34, 35). Travillion states that he made "cereal" [sic] complaints to Defendants Duncan and Rutherford and they consistently responded that they are unable to effectuate cell reassignments. (Doc. 70, ¶15).

Inmates in the RHU are seen on daily rounds by medical and mental health staff. (Doc. 63, ¶ 23; Doc. 70, ¶ 23). They are also seen on weekly rounds by their assigned counselors. (*Id.*; *Id.*) The PRC also makes weekly rounds through the RHU. (*Id.*; *Id.*) Notes of any exchanges with counselors, psychology staff, and PRC members are entered into the inmate's adjustment records and notes of any encounters with medical staff are entered into the inmate's medical record. (Doc. 63, ¶ 24). Neither Johnson nor Travillion had any entries in their respective adjustment records indicating that there was a possible risk of harm to Travillion from Johnson. (*Id.* at 25). Travillion was seen between May 5, 2012, and June 14,

2012, by his assigned counselor, the PRC, a licensed psychology manager, and a unit manager and failed to note any concerns.  (*Id.* at 26).

On June 14, 2012, Defendants Gates and Druckemiller escorted Travillion to his cell after his shower.  (Doc. 63 ¶ 28; Doc. 70, ¶ 28).  At the time, Johnson appeared to be asleep.  (*Id.* at 29; *Id.*at 29).  Johnson was not handcuffed before the cell door was opened.  (Doc. 70, ¶ 31).  Travillion was placed in his cell and Defendants Gates and Druckemiller closed the door.   (Doc. 63, ¶ 30; Doc. 70, ¶ 30).  Pursuant to standard security procedures, Travillion remained handcuffed and tethered through the cell door.  (*Id.* at 31; *Id.*at 31).  Upon closing the door, Johnson jumped up and began punching Travillion.  (*Id.* at 32; *Id.*at 32; Travillion Dep. , Doc. 70-3,  pp. 21, 22).  Officer Druckemiller called for the door to be opened and Officer Gates ordered Johnson to stop hitting Travillion.  (*Id.* at 33; *Id.*at 33).  Several other corrections officers responded to the call when they heard Officer Gates order Johnson to stop hitting Travillion.  (*Id.* at 34; *Id.*at 34).  The door was opened and the officers entered the cell and restrained Johnson.  (*Id.* at 35; *Id.*at 35).

Travillion was medically evaluated by a nurse.  (*Id.* at 36; *Id.*at 36).  He sustained superficial scratches on his neck and chest; he denied suffering from any pain. (*Id.* at 37; *Id.*at 37).  He requested additional medical attention early in the

morning of July 15, 2012, after having vomited what he believed to be blood. (*Id.* at 38; *Id.* at 38). Travillion states that his initial request for medical assistance was denied by Defendants Weaver and Perks who "instructed Plaintiff to tell the next shift about his problem" because RHU policy did not allow inmates to receive medical attention at that hour of the morning, barring exceptional circumstances. (Doc. 70-3, p. 22, ¶ 19). He was examined by a nurse at 7:30 a.m. on June 15, 2012, and referred to a physician's assistant for additional evaluation. (Doc. 63, ¶ 39; Doc. 70, ¶ 39). He was assessed with no neurological deficits and the blood test on the vomit was negative for presence of blood, but the possibility of a mild concussion was not ruled out. (Doc. 63, ¶ 40; Doc. 70, ¶ 40; Doc. 70-4, p. 6). He was given Phenergan for his complaints of nausea and instructed to rest. (*Id.*; *Id.*; *Id.*)

On July 5, 2012, Travillion filed Grievance 418619 regarding the assault that occurred on June 14, 2012 incident. (Doc. 63, ¶¶ 42, 52; Doc. 70 ¶¶ 42, 52). Grievance 418619 makes no reference to the denial of medical care that allegedly occurred on June 15, 2012. (Doc. 63-12, pp. 47-54).

Inmate Grievances are handled in accordance with the Department of Corrections' Inmate Grievance System policy, DC-ADM 804. (*Id.* at 45; *Id.* at 45). The Department of Corrections' grievance system is a three-tiered system.

(*Id.* at 46; *Id.* at 46). Travillion pursued Grievance 418619 through all levels of review.

## III. Discussion

### A. Constitutional Claims

#### 1. Failure to Exhaust Administrative Remedies

Defendants first seek an entry of summary judgment on the grounds that Travillion failed to fully exhaust his administrative remedies, as required by 42 U.S.C. § 1997e(a). The Prison Litigation Reform Act of 1996 (the "PLRA") "mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016); *see Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000) ("[I]t is beyond the power of this court—or any other—to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis."). The text "suggests no limits on an inmate's obligation to exhaust– irrespective of 'special circumstances.'" *Id.* "And that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account. *See Miller v. French*, 530 U.S. 327, 337, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (explaining that "[t]he mandatory 'shall' ... normally creates an obligation impervious to judicial discretion")." *Id.* at 1856-57.

Significantly, "the PLRA contains its own, textual exception to mandatory exhaustion," *i.e.* the PLRA requires exhaustion of "available" administrative remedies. *Id.* at 1858. "Available" is defined as "capable of use for the accomplishment of a purpose" and that which "is accessible or may be obtained." *Id*. at 1858-59, (quoting *Booth v. Churner*, 532 U.S. 731, 737-38 (2001)). There are three instances in which administrative remedies are unavailable. "First, as Booth made clear, an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end– with officers unable or consistently unwilling to provide relief to aggrieved inmates." *Id.* at 1859. "Next an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, administrative remedies are unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*

The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjunctive system can function effectively without imposing some orderly structure on the course of its

proceedings." *Id.* at 90–91. Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seek[ ] to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Id.* at 93 (quoting *Porter v. Nussle*, 534 U.S. 516, 525 (2002)). The requirement may not be satisfied "by filing an untimely or otherwise procedurally defective . . . appeal." *Woodford*, 548 U.S. at 83; *see also Spruill v. Gillis*, 372 F.3d 218, 228–29 (3d Cir. 2004) (utilizing a procedural default analysis to reach the same conclusion). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 211–212 (2007).

Finally, whether an inmate has exhausted administrative remedies is a question of law that is to be determined by the court, even if that determination requires the resolution of disputed facts. *See Small v. Camden County*, 728 F.3d. 265, 268 (3d Cir. 2013); *see also Drippe v. Tobelinski*, 604 F.3d 778, 781 (3d Cir. 2010).

Inasmuch as Defendants argue that Travillion's claims are procedurally defaulted based on his failure to identify any of the individual defendants in his

grievance, the Court concludes that Travillion's fact laden description of the June 14, 2012 altercation, including the identification of Defendant Clark and "RHU Staff and Unit Management," contained in Grievance 418619 and its attachments, is sufficient for purposes of administrative exhaustion of the portion of the failure to protect claim related to the June 14, 2012 incident. (Doc. 63-12, pp. 47-49, 51, 52, 54). The Court also concludes that that his statement that he "seeks, among other relief available through a court, monetary damages" sufficiently indicates that, in the event that he pursues the matter beyond the administrative review process, he may seek relief other than monetary compensation. (*Id.* at pp. 48, 52). This failure to protect claim is fully exhausted and will be considered on the merits.

Conversely, Travillion's grievance wholly fails to raise the portion of the failure to protect claim that challenges the May 5, 2012 decision of Defendants Kearns, Burton, Sherman, Crawford and Stover to place him in the cell with Johnson, and the claim that Defendant Perks and Weaver denied him adequate medical care on June 15, 2012. Consequently, Defendants are entitled to an entry of judgment on these claims as they are unexhausted and procedurally defaulted.

2.     Merits

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials.  *See* 42 U.S.C. § 1983.  The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

*Id.; see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).

Travillion brings his failure to protect claim under the Eighth and Fourteenth Amendments.  While pretrial detainees are protected from "punishment" by the Due Process Clause of the Fourteenth Amendment, *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), convicted and sentenced inmates are protected by the Eighth Amendment.  *Farmer v Brennan*, 511 U.S. 825, 833 (1994).  Travillion's claim will therefore be considered solely in the context of the Eighth Amendment.

The Cruel and Unusual Punishment Clause of the Eighth Amendment imposes on prison officials "a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833; *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997). "Being violently assaulted in prison is simply 'not part of the penalty that criminal offenders pay for their offenses against society.' " *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). To survive summary judgment on a claim for damages against a prison official for failure to protect an inmate from violence caused by other inmates, as is the case here, a plaintiff must produce sufficient evidence establishing that: (1) he was incarcerated under conditions posing a substantial risk of serious harm (an objective inquiry); (2) the prison official acted with deliberate indifference to the substantial risk to his health and safety (a subjective inquiry); and, (3) the prison official's deliberate indifference caused him harm. *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) (citing *Farmer*, 511 U.S. at 834; *Hamilton*, 117 F.3d at 746).

### a. Objective Inquiry

"[An inmate plaintiff] must show 'a pervasive risk of harm to inmates from other prisoners' " in order to show prison conditions posing a substantial risk of harm arising from an inmate on inmate assault. *Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir. 1985) (quoting *Woodhous v. Virginia*, 487 F.2d 889, 890 (4th Cir. 1973)) (emphasis added). "A pervasive risk of harm may not ordinarily be shown by

pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror." *Id.* (quoting *Shrader v. White*, 761 F.2d 975, 978 (4th Cir. 1985)). Travillion contends that Inmate Johnson's history of mental illness, his institutional misconduct record, and his threat of physical harm directed at Inmate Thomas demonstrates that he posed an "obvious danger" to him and others. (Doc. 68, p. 11).

To the extent that Travillion argues that Defendants' response to his request for admissions establishes a history of mental health, he is mistaken. Defendants' response specifically states "[i]t is DENIED that Inmate Johnson was suffering from any mental illness that constituted a danger to Plaintiff." (Doc. 70-1, p. 7, ¶ 9).

Travillion next focuses on four Misconduct Reports received by Johnson. The first incident occurred in December 2011, and led to Misconduct Report B500609. (Doc. 70-2, p. 16). Johnson reportedly approached a correctional officer in a threatening manner with closed fists and was charged with refusing to obey an order, presence in an unauthorized area, and threatening an employee or their family with bodily harm. However, the charge of threatening an employee or their family with bodily harm was dismissed following a hearing. (*Id.*) The incidents giving rise to Misconduct Reports B505115 and B505113, occurred on April 5, 2012. The first report charged Johnson with assault and using abusive,

obscene or inappropriate language to an employee after he reportedly shoved and "chest bumped" Correctional Officer Miller.  (*Id.* at 14).  The second report charged him with threatening an employee or their family with bodily harm based on Johnson's statement to another correctional officer that he was going to kill Correctional Officer Miller when he got "out of the hole."  (*Id.* at 12).  Following hearings, Johnson was found guilty of all charges.  On April 24, 2012, following a vulgar verbal thrashing from Johnson, Defendant Rutherford issued Misconduct 505060 charging him with the use of abusive, obscene, or inappropriate language and threatening an employee.  At his misconduct hearing, Johnson pled guilty to the use of foul language; the hearing examiner dismissed the threatening an employee charge.  With the exception of one instance, Johnson's offending conduct is more verbal than physical and is indicative of Johnson's hostility toward, and disdain for, correctional officers, not other inmates.  Moreover, the single physical encounter of which Johnson was found guilty involved a shove and a "chest bump" of a correctional officer and appears to be an isolated incident.

Travillion also submits as evidence his contention that Johnson "threatened violence against Inmate Thomas less than an hour before Defendants Kearns, Burton, Sherman, Crawford and Stover locked Plaintiff in the cell with him on May 5th, 2012."  (Doc. 68, p. 11).  In support, he cites to his declaration which, in turn, wholly relies on the Hampton declaration.  However, Hampton's declaration

makes no mention of threats of violence against Inmate Thomas. In fact, Hampton specifically declares that there was yelling between Johnson and staff and that he "couldn't understand what [Johnson] was saying." (Doc. 29, ¶ 4). Travillion's assertion that Johnson threatened violence against Thomas within an hour of being placed in the cell with him is not supported by the evidence. Rather, it is completely contrary to the credible record evidence which indicates that Thomas was reassigned based on his request for a standard cell change due to personal issues. (Clark Decl., Doc. 63-6, ¶14).

The evidence relied upon by Travillion fails to demonstrate that, at the time of the attack, there was a pervasive risk of harm to inmates from Johnson or any other prisoners. Consequently, Defendants Clark, Hardy, Sutton, Duncan, Rutherford, Gates and Druckemiller are entitled to an entry of summary judgment.

b.     *Subjective Inquiry*

Even had Travillion met the objective inquiry prong, Defendants would be entitled to summary judgment as there is no evidence that Defendants possessed actual knowledge that Johnson presented an excessive risk of harm. "[T]he official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Beers–Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001). Actual knowledge can exist where "a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by

prison officials in the past," and where "circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Id.* (quoting *Farmer*, 511 U.S. at 842–43). It is insufficient, however, for an official to simply be "aware of facts from which the inference can be drawn that a substantial risk of serious harm exists." *Farmer*, 511 U.S. at 837.

Travillion submits that his June 7, 2012 conversation with Defendant Clark, which was memorialized in a written request slip, is sufficient to find that Defendant Clark possessed actual knowledge of the excessive risk of harm Johnson presented. Clark denies receiving the request slip and it is not a part of Travillion's adjustment record. (Doc. 63 ¶ 24). Even if Clark was aware of the underlying facts but believed that the risk to which the facts gave rise was insubstantial or nonexistent, liability will not attach. *Farmer*, 511 U.S. at 844. Travillion expressed that his cellie was exhibiting strange behavior, '[b]ehavior which leads me to believe he is obviously suffering from some type of psychosis or other mental anguish. Johnson's behavior is a danger to him and most importantly to me." (Doc. 63-12, p. 49). The request slip did not notify Clark of any "specific incident or cause of tensions between the cellmates" from which an inference could be drawn that an excessive risk was present. *Blackstone v. Thompson*, 568 F. App'x. 82, 84 (3d Cir. 2014) (not precedential). Travillion's general statements,

devoid of a particularized threat of harm, are simply insufficient to demonstrate that Defendant Clark knew that Travillion faced a substantial risk such that he could be considered deliberately indifferent to that risk. *Jones v. Beard*, 145 F.App'x. 743, 746 (3d Cir. 2005) (not precedential).

Likewise, statements made by Travilion in the weeks preceding the attack fail to establish that the guards had actual knowledge of a threat of serious harm. *See Farmer*, 511 U.S. at 846 (noting that to defeat summary judgment a plaintiff must present enough evidence to support the inference that the prison official "knowingly and unreasonably disregarded an objectively intolerable risk of harm"). Travillion verbally informed several guards that he wanted to be moved from his cell assignment based on Johnson's mental health and reputation for violence and indicated that Johnson was making violent threats and gestures at him. (Doc. 70-3, ¶¶ 8-11, 13, 15). The guards consistently informed Travillion that they were not responsible for cell assignments and that he had to reduce his complaints to writing. (*Id.*) Although he represents that he submitted written requests, there is no substantiating documentation in the record. Further, there is no indication that Travillion articulated specific threats of serious harm. *See, e.g., Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir.1998) (noting that "threats between inmates are common" and do not, in every circumstance "serve to impute

actual knowledge of a substantial risk of harm") (citations and internal quotations omitted).

Lastly, there is no evidence that Defendants Gates and Druckemiller, the guards who placed Travillion in his cell and witnessed the assault, possessed any actual knowledge of a threat to Travillion's safety prior to placing Travillion in the cell. Further, to the extent that the claims against these Defendants can be construed as a failure to intervene on Travillion's behalf, "[t]he plaintiff must show that the official either failed to act or took only ineffectual action under circumstances indicating that his or her response to the problem was the product of deliberate indifference to the prisoner's plight." *Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989)). The record clearly indicates that these Defendants took immediate action to assist Travillion and halt the assault.

### c. Harm

Had Travillion cleared the objective and subjective inquiries, Defendants would still be entitled to an entry of summary judgment. Not "every injury suffered by one prisoner at the hands of another… translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Courts within this Circuit have found that a plaintiff's failure to protect claim cannot proceed in the absence of a serious injury. *See Matthews v. Villella*, 381 F. App'x. 137, 139 (3d Cir. 2010) (affirming district court's dismissal of

failure to protect claim, finding that the plaintiff's "alleged injuries do not rise to the level of 'serious harm,' and he has not alleged a 'pervasive risk of harm' from this single incident"); _Jones v. Pugh_, 2011 WL 5244422, at *13 (finding that the plaintiff "had not met either the objective or subjective element of a failure to protect claim...since the evidence shows that the alleged single push by [the defendant] and [the plaintiff's] injury were only minor").  Travillion suffered superficial scratches on his neck and chest and denied suffering from any pain. (Doc. 63, ¶ 37; Doc. 70, ¶ 37).  He sought medical attention early in the morning of July 15, 2012, after having vomited what he believed to be blood.  (_Id._ at 38; _Id._ at 38).  Medical staff determined that he had no neurological deficits and the blood test on the vomit was negative for presence of blood; the possibility of a mild concussion was not ruled out.  (Doc. 63, ¶ 40; Doc. 70, ¶ 40; Doc. 70-4, p. 6).  He was prescribed medication to settle his stomach and instructed to rest.  Clearly, Travillion did not sustain a serious injury.

## B.    State Law Claims

Whether to exercise supplemental jurisdiction is within the discretion of the court.  Section 28 U.S.C. § 1367(c)(3) provides that district courts may decline to exercise supplemental jurisdiction over a state law claim if the district court has dismissed all claims over which it has original jurisdiction. When deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in

each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cahill*, 484 U.S. 343, 350 (1988)). "[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Miflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)).

Following thorough considerations of judicial economy, convenience, and fairness, we decline to exercise supplemental jurisdiction over the remaining pendent state law claims.

## IV.    <u>Conclusion</u>

Based on the foregoing, Defendants' motion (Doc. 58) for summary judgment will be granted on the federal constitutional claims. We decline to exercise supplemental jurisdiction over the state law claims.

A separate order will enter.